UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| **LEGACY HOUSING CORPORATION,** | § § § § | |
| Plaintiff, | | |
| vs. | § | CIVIL ACTION NO. 1-21-cv-1156 |
| | § § | |
| **THE CITY OF HORSESHOE BAY, TEXAS** and **THE HORSESHOE BAY PROPERTY OWNERS ASSOCIATION, INC.** and **HORSESHOE BAY RESORT, INC.** | § § § § § § | |
| Defendants. | § | |

**PLAINTIFF'S COMPLAINT**

Plaintiff Legacy Housing Corporation ("Legacy") files this Complaint against Defendants the City of Horseshoe Bay, Texas (the "City") and the Horseshoe Bay Property Owners Association, Inc. (the "POA") and the Horseshoe Bay Resort (the "Resort") and for cause of action would respectfully show the court as follows:

**I. JURISDICTION AND VENUE**

1. This case involves an unconstitutional regulatory taking of Plaintiff's property by the City of Horseshoe Bay as well as other causes of action against all defendants including a claim for declaratory judgment brought pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C.A. § 2201 for a declaration of rights of the parties.

2. The Court has federal question jurisdiction over this lawsuit pursuant to 28 U.S.C §1331 and pursuant to 28 U.S.C.A. § 2201.

3. Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(1) and (2) because Defendants reside in the Western District of Texas and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district. Acts giving rise to this

complaint occurred within this judicial district.

## II.  PARTIES

4. Plaintiff, Legacy Housing Corporation, is a publicly traded Texas corporation with its principal office located in Bedford, Tarrant County, Texas.

5. Defendant, the City of Horseshoe Bay, is an incorporated city in Burnet and Llano Counties, Texas, with its headquarters located in Llano County and may be served with process through its Mayor, Cynthia Clinesmith, 1 Community Drive, Horseshoe Bay, Texas 78657.

6. Defendant, the Horseshoe Bay Property Owners Association, Inc. is a Texas non-profit corporation with its principal office located in Llano County, Texas, and may be served with process through its registered agent for service of process, Nancy Ritter, Quail Point Lodge, 107 Twilight, Horseshoe Bay, TX  78657.

7. Defendant, the Horseshoe Bay Resort, Inc. is a Texas for-profit corporation with its principal office located in Llano County, Texas, and may be served with process through its registered agent for service of process, Brad K. Hatfield, 9000 Hwy 2147 West, Suite 101, Horseshoe Bay, TX  78657.

## III.  WAIVER OF IMMUNITY

8. To the extent that the Defendant the City has claimed immunity related to Legacy's claims made the basis of this suit, such immunity does not exist as sovereign immunity does not protect the government from a Fifth Amendment Takings claim because the constitutional mandate is "self-executing." *See United States v. Clarke*, 445 U.S. 253, 257, 100 S.Ct. 1127, 63 L.Ed.2d 373 (1980); *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 315-16 (1987); *Knick v. Township of Scott*, 139 S. Ct. 2162, 2171-72 (2019) (just compensation remedy is immediately actionable in federal court when a taking occurs); *See Gen. Servs. Comm'n v. Little–Tex Insulation Co., Inc.*, 39 S.W.3d 591, 598–99 (Tex.2001)(noting that

governmental immunity "does not shield the State from an action for compensation under the takings clause"); *Steele v. City of Houston*, 603 S.W.2d 786, 791 (Tex.1980)("The Constitution itself is the authorization for compensation for the destruction of property and is a waiver of governmental immunity for the taking, damaging or destruction of property for public use.").

## IV.  CONDITIONS PRECEDENT

9. All conditions precedent to recovery have been performed, waived, or have occurred. *Knick v. Township of Scott*, 139 S. Ct. 2162, 2171-72 (2019) (just compensation remedy is immediately actionable in federal court when a taking occurs).

## V.  AGENCY AND RESPONDEAT SUPERIOR

10. Whenever in this Complaint it is alleged that Defendants did any act or thing, it is meant that Defendants or their general partners, assigns, agents, officers, servants, officials, employees, subsidiaries or representatives did such thing or act.  It was also done with the full authorization and ratification of Defendants or done in the normal routine, course, and scope of the assignment, agency or employment of Defendants or its assigns, agents, officers, servants, employees, subsidiaries or representatives.  Thus, Defendants are not only liable for their own conduct, but are vicariously liable for the above-described conduct of its agents, officers, servants, subsidiaries or representatives pursuant to the doctrine of agency at common law and as provided by the statutes and constitutional provisions governing the claims asserted herein.

11. Legacy also reserves the right to amend/assert a cause of action against any City official or employee in their individual capacity, the identity of which Legacy is unaware at this time, for any acts that exceed their authority (*ultra vires*) or for which they engaged in the scope of employment or official capacity, upon the discovery of their identity.

## VI.  FACTUAL BACKGROUND

12. Legacy is a well-respected and reputable producer of manufactured, tiny, and modular homes. As the third largest manufactured housing company in the nation, Legacy owns and operates three factories and sells its products in more than 15 states. In 2019, Legacy began acquiring residential lots in the City zoned for manufactured housing with plans to develop the lots with manufactured homes. Specifically, in 2019, Legacy purchased the following property consisting of 297 lots for the purpose of development of manufactured homes:

> Lots K1003, K2003, K2010, K2014, K2018, K2026-27, K2029, K2031-34, K2050, K2056-57, K2066, K2071, K2077-79, K2085, K2087, K2089, K2091, K2096-98, K3003, K3009-10, K3015-17, K3021-23, K3026, K3028, K3033, K3039, K3046, K3050, K3053, K3056, K3058, K3061, K3064, K3071, K3074-75, K3079, K3081, K3084, K3107, K3109, K3117, K3119, K4012, K5008, K5014, K5016-18, K5028, K6002-03, K6006, K6011, K6017, K6022-24, K6038, K6043, K6046, K6049-50, K6061, K6063, K6065-66, K6069, K6074, K6076, K6083-88, K6094, K6096, K6099, K6112, K7001-19, K7021, K7025, K7027, K7030, K7036-37, K7064-7071, K7083, K7085, K7092-93, K7103-04, K7120, K7127-28, K7142-44, K7154-57, K7161-63, K7172, K7174, K7180, K7183, K7185, K7191-93, K7197-99, K7204, K7206, 7209-11, K7217, K7219-24, K7228-29, K7232-35, K7237-41, K7243, K7246, K7248-49, K7252-53, K7256-62, K7264, K7266-67, K7270, K7272-73, K7277-78, K7281-83, K7285, K7287-93, K7297, K7300-01, K7303, K7305-06, K7311, K7313, K7317, K7319-21, K7330, K7332, K7334-38, K7341-42, K7344-53, K7365-66, K7368-69, K7374-76, K7386-87, K7396-97, K7401-02, K7404, K7409, K7412, K7416, K7418-19, K7421-24, K7426-27, K7433, K7437-38, K7441-50, K7455-56, K7464, K7468, K7470, K7474-77, K7483-84, K7488-89, K7492, K7495-501, K11080 and K11103, Horseshoe Bay South, a subdivision in the City of Horseshoe Bay, Burnet County, Texas as shown on various plats recorded in the Plat Records of Burnet County, Texas.

(the "Property"). At the time that Legacy purchased the Property there were no existing ordinances that prohibited, impeded or negatively impacted Legacy's ability to development the Property using all its models of modular homes and as allowed by state and federal law. Thus, Legacy had an investment backed expectation that it could fully develop the Property for modular homes.

**Unconstitutional Regulatory Taking of Legacy's Property**

13. However, April 13, 2021, the City adopted Ordinance 2021-12 ("Ordinance") which changed the zoning and building requirements imposed on the Property to such a degree that it prohibits Legacy's development of the Property using its modular home models as were previously allowed and imposing unreasonable and additional burdens that make the development of the property cost-prohibitive. In this regard, the proposed Ordinance has a devastating adverse economic impact which interferes with Legacy's investment-backed expectations for the Property, that being a development for manufactured homes. Specifically, the City imposed an unnecessary and cumbersome registration scheme defining "manufactured housing contractor" that must be registers and subject to regulation by the City so broadly that it includes the any third party that installs, delivers or sets up the house, including any third party plumber, electrician, water and wastewater contractor (such as a septic contractor) and foundation and skirting contractors. Ordinance at 3.03.006. Legacy must only use these third parties that are registered with the City.

14. The Ordinance thus imposes unreasonable burdens on Legacy's investment backed expectations for the Property by limiting, restricting, and driving up costs for necessary subcontractors and tradesmen required for Legacy to be able to develop the Property as intended when purchased. These burdens did not exist when Legacy purchased the property. Moreover, these additional restrictions and burdens related to the use of third party subcontractors and tradesmen are not imposed by the City for standard home development. The Ordinance requires Legacy to only use plumbers and electricians who are registered with the City as "manufacturing housing contractors." Other developers who develop subdivisions with non-modular home developments can use any state license plumber, electrician and any foundation or other contractor that they wish. Due to the Ordinance, Legacy cannot.

15. Additionally, subcontractors, plumbers and electricians working on manufactured homes are subject to business profile and background checks conducted by the City, whereas

plumbers and electricians working on non-manufactured housing are not. 3.03.010(a)(9)(H),(G) Similarly, plumbers and electricians working on manufactured homes must provide three examples of their work on manufactured homes and provide a list of references as well as unspecified "other information requested" by the City. Plumbers and electricians working on non-manufactured homes are not subject to these requirements. 3.03.010(a)(9)(H),(G). Additionally, plumbers and electricians working on manufactured homes have stricter insurance requirements than those who do not work on manufactured houses. Specifically, plumbers and electricians working on manufactured homes must have minimum aggregate insurance coverage of $600,000 and $300,000 per occurrence. No such minimum requirements exists for plumbers and electricians working on non-manufactured homes. Instead, plumbers and electrician working on non-manufactured homes must simply be insured. 3.03.010(a)(9)(H),(G).

16. Furthermore, the Ordinance requires Legacy to provide "[t]hree (3) or more examples of previous manufactured homes placed on property and references from previous clients *or other information requested by the development services director or his/her designee…*" 3.03.010(a)(9)(H),(G). The City is using "other information requested" to require arbitrary information and actions from Legacy prior to issuing a permit that has no rational basis to the impact of the development of the Property on the City. For example, the City, in an email to Legacy, required a "a letter of recommendation from 1 financial institution and two individuals who can attest to workmanship" as a condition of receiving a construction permit for future developments. See **Exhibit A** attached hereto. Importantly, the "workmanship" requirements are not codified in City law and appeared to be random at the whim of City officials and targeted directly at Legacy. Moreover, these requirements failed to consider that Legacy is a publicly traded company whose financial statements are available on Legacy's website and the Securities Exchange Commission's website. Similarly, at the time of the request, the City was aware Legacy

could not provide recommendations from individuals who could "attest to workmanship" of Legacy's developments because Legacy had only recently completed its first-ever development, coincidentally located in the City, and had only received final approval, in the form of a certificate of occupancy, for the developments from the City six days prior.

17.     The City has further randomly, without any rational basis, imposed an arbitrary cap on the number of construction permits it will issue to Legacy for speculative builds. Legacy owns approximately 297 manufactured housing lots in the City. It takes approximately seven months to develop a manufactured home in the City, and under the current cap of two permits, it would take Legacy approximately 87 years to develop all of its lots, if it developed two lots at a time. The City has used its cap on speculative building permits to, essentially, forbid Legacy from developing manufactured housing. Moreover, the City continues its regulatory taking of Legacy's Property (which also directly impacts Legacy's target marker of lower income working-class citizens of the City) by restricting the age of manufactured homes allowed in the City. Under current law, homes need to be three years old or newer or they are prohibited. There is no logical basis for this requirement. Home models rarely change much from year to year, and often, there isn't much of a structural or design difference between two homes of the same model produced three years apart. The City has significantly impacted Legacy's investment backed expectations for the Property by imposing ordinances and regulations that reducing Legacy's pool of available consumers who can purchase homes in its development by banning new but older model homes that can be sold at a lower price point.

18.     In addition, the City imposes high utility fees on Legacy that has no relation to the use of the Property by Legacy in order to cover costs that should be paid by others or the City itself.  For example, Legacy is made to purchase "grinder equipment" priced at $2,525 along with a fee in excess of $10,105 for utility hook-up.  Manufactured homes typically have a much smaller

footprint than many of the homes found in the City. The City's exorbitant utility fees are compounded by a requirement that manufactured homes have permanent foundations. Permanent foundations for manufactured homes must be installed by professionals (who must also undergo the burdensome registration process described above) and must also be inspected by experienced professional engineers familiar with The United States Department of Housing and Urban Development permanent foundation standards. This requirement did not exist for modular homes when Legacy purchased the Property.  In fact, manufactured homes typically do not have permanent foundations for two main reasons. First, it is common for manufactured homeowners to relocate their homes. Second, permanent foundations do not have a functional safety value. Manufactured homes are typically secured in place using a tie down system. Tie down systems are effective at keeping homes secured to the ground in all weather conditions, including hurricanes. The Ordinance in this regard not only significantly impacts Legacy's investment backed expectations, but may jeopardize the safety of its citizens living in the homes. All of the above exactions well exceed any burden imposed by the Legacy's development on the Property. The City refused to let the development move forward if Legacy does not pay these and other exactions, and has continued to shut down the subdivision and denied further approvals or variances.

Sec. 1201.252. POWER OF LOCAL GOVERNMENTAL UNIT TO ADOPT DIFFERENT STANDARD. (a) A local governmental unit of this state may not adopt a standard for the construction or installation of manufactured housing in the local governmental unit that is different from a standard adopted by the board unless, after a hearing, the board expressly approves the proposed standard.

(b) To adopt a different standard under this section, the local governmental unit must demonstrate that public health and safety require the different standard.

19. The City Ordinance also imposes setback requirements that drastically reduce the amount of developable land. City setback requirements are as follows: 10' in the front, 15' in the back, and 5' on each side. These setback requirements did not exist for modular homes when Legacy purchased the Property. After accounting for setbacks, only 2,275 square feet of land on a 45' x 90' lot can be developed, 56.17% of its total land area. By the Ordinance, the City requires manufactured housing developments to include a paved driveway of not less than 400 square feet and at least 12 feet wide. After accounting for the yard setbacks and minimum driveway requirement, only 1,875 square feet of land is available for a manufactured home. Porches, decks or patios are required at either the front or rear door of each home and all decks, porches, and patios must have a combined area of 150 square feet and cannot be included in the setbacks. After accounting for setbacks; minimum driveway requirements; and minimum porch, deck and patio requirements, only 1,725 square feet of land is available for a manufactured home. As a result of the City's strenuous lot requirements for setbacks, driveways, porches, decks, and patios, Legacy is left with a lot that is virtually undevelopable for modular homes.

20. Furthermore, the City has done everything in its power to obstruct Legacy from successfully navigating the development process, including intentionally misleading Legacy on its chances of successfully securing a zoning variances. Legacy relied, to its own detriment, on the City's promise to grant Legacy zoning variance. Legacy spent money advertising its variance request and noticing its neighbors twice in an effort to comply with relevant law, only for the City to recommend the Board of Adjustments deny the variance request. A city council member informed Legacy that council was "standing together on this one."

21. The above described egregious conduct of the City of imposing burdensome and arbitrary regulations, registration requirements, and denying variances on that ground as well as necessary approvals for permitting, is a compensable taking as it does not bear an essential nexus

to the substantial advancement of some legitimate governmental interest and it is not roughly proportionate to the projected impact of the proposed Legacy modular home development. Specifically, the City cannot show it made an individualized determination of how the impact was measured in a meaningful way as to how the impact of the subdivision is roughly proportionate in nature and extent to the setbacks, registrations, fees and improvements it required and imposed on Legacy and its modular home development in order to obtain permits for development. Consequently, the above Ordinance and exactions constitute a regulatory taking in violation of the 5th Amendment of the Federal Constitution, as well as the Texas Constitution, for which Legacy seeks just compensation.

**The POA and the Resort Colluded and Conspired Against Legacy**

22. The Articles of Incorporation for the POA provide that the POA shall have the following specific purposes:

> * * *
> (2)   To operate and maintain or provide for the operation and maintenance of any properties which may be from time to time designated or conveyed to the Corporation for the general welfare of the inhabitants with regard to health, safety, education, culture, recreation, comfort *and convenience*.

Horseshoe Bay Property Owners Association, Inc., Articles of Incorporation, Article Four. (emphasis added). In addition, the Declarations of the POA provide that "each member shall be entitled to the use and enjoyment of the Properties and Common Land as provided in the Restrictions." *See* Amended and Restated By Laws of the Horseshoe Bay Property Owners Association, Inc., a Non Profit Corporation, dated November 15, 2017, Article VI. At its most northern point, the Legacy Property borders a five-foot strip of land located in the City that is owned by the POA for the benefit of its members. Unfortunately, the POA accepted money for its capital budget from the City in exchange for refusing Legacy access to the five-foot strip and agreeing to press charges against anyone who crosses the POA's land, including POA dues paying

members (including Legacy and South residents). This action on the part of the POA violates its purpose as stated in the Articles of Incorporation and constitutes and ulta vires action which has caused damages to Legacy. Similarly, the City has notified Legacy of its plans to deny any permit applications to construct a driveway on Legacy's residential lots separated from the Property by the POA's five-foot strip. Moreover, the POA's wrongful conduct against its due paying members who own land and live in South is so deeply rooted that it has refused to provide amenities to South residents, despite receiving additional contributions to its capital budget from the City. The POA's capital budget has historically been funded by annual dues paid by its members. Unfortunately, the POA diverts 60% of its dues to the Resort, a for-profit, private entity. The remaining 40% of annual dues are managed by the POA and allocated to projects outside of South. The Resort is conspiring with the POA in this regard to obtain a majority of the funds.

23. Moreover, to develop a manufactured housing lot in the City, Legacy most first seek approval from the Resort before the City will even consider issuing a construction permit. Development in the City should not be subject to the whims of an unaccountable privately owned entity that is not an official governmental body. Specifically, the Resort has full discretion to reject development plans based on arbitrary and costly requirements. For example, the Resort requires manufactured homes to have an unnecessary "yard light" that must be purchased from the Resort's designated vendor- the POA. It is unconscionable that an unaccountable for-profit, privately owned entity can halt development for the lack of a $400 "yard light" that has no useful function. In an astounding act of hubris, the Resort admits the light is for decorative purposes on their website. The Resort is conspiring with the POA and the City to prevent developments of manufactured housing. According to the Resort, "no building…shall be erected, altered, added to, placed or permitted to remain on any Lot or Land until and unless the plans showing floor areas,

external design, structural details, plot plan, landscaping plan…and all other surface improvements to Lot or Land as approved by the [Resort]".

24. The Resort is conspiring with the City and the POA and using this language to deny development of Legacy's modular homes under the guise that "some of its guidelines are written as broad standards and the interpretation of these standards is left to the discretion of the [Resort]". The Resort has covered its wrongdoing in this regard by not requiring itself to issue decisions on development applications within a specified time after receiving the application. Under the current scheme, the Resort could conceivably end a manufactured housing development before it begins by refusing to even consider a duly submitted development application, resulting in an indefinite delay of manufactured housing developments. The Resort has used its unfettered power structure to conspire with the City and the POA to deny Legacy the use of its property for modular homes, which was Legacy's investment backed expectation and facilitated a taking by the City under the state and federal constitutions.

## VII. CAUSES OF ACTION

### COUNT I- DECLARATORY JUDGMENT

25. Legacy repeats and incorporates by reference the paragraphs above, as applicable, as if fully restated herein.

26. Pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C.A. § 2201 Legacy seeks a declaration of its rights, status and legal relations with respect to the scope and constitutionality of Ordinance 2021-21 which has been used by the City to burden the property with regulations that prohibit its development for modular homes as expected by Legacy when it purchased the property under laws existing at the time. Legacy also seeks a declaration of the scope and constitutionality of Ordinance No.2021-21 that imposed registrations, fees, improvements and setbacks that impose undue burdens on Legacy's modular home development

and investment backed expectations for the Property. In this regard, Legacy seeks a declaration that:

(a) Ordinance 2021-12 is unconstitutional as applied in this case, is discriminatory Zoning and constitutes a regulatory taking under the Fifth Amendment of the United States Constitution;

(b) The City is not authorized by Ordinance No. 2021-21 to require Legacy to use subcontractors, electricians, plumbers and other tradesmen in a manner different from that of non-modular housing developers;

(c) The City is not authorized to place an arbitrary cap on the number of construction permits it will issue to Legacy for speculative builds;

(d) The City is not authorized to impose high utility fees on Legacy that have no relation to the use of the Property by Legacy in order to cover costs that should be paid by others or the City itself. Specifically the City cannot mandate that Legacy purchase "grinder equipment" priced at $2,525 from the POA along with connect fee in excess of $10,000;

(e) To the extent such Ordinance No. 2021-12 and other statutes or rules of the City require Legacy to pay impact fees, connect fees or purchase utility equipment, these fees constitute an exaction, lack an essential nexus and are not roughly proportionate to the effects of the Legacy development on the Property, and the Ordinance is unconstitutional as applied in this case;

(f) The City cannot require by Ordinance that manufactured homes have permanent foundations which is not typical for modular homes when it serves no public purpose;

(g) The POA does not have the authority to deny Legacy access to the five-foot strip of land owned by the POA, of which Legacy is a member;

(h) The POA does not have the authority to discriminate and provide a disproportionate amount of funding from the dues to the Resort as compared to the South residents;

(i) That the Resort does not have the unfettered power to prohibit and deny Legacy to lawfully develop the Property as a modular home development and has abused its power in that regard or acted *ultra vires*.

27. As stated herein, there is a real and substantial justiciable controversy between Legacy, the City, the POA and the Resort concerning their respective rights under the Ordinances and Declarations governing the Property.

## COUNT II- UNCONSTITUTIONAL REGULATORY TAKING

28. Legacy repeats and incorporates by reference the paragraphs above, as applicable, as if fully restated herein.

29. The Just Compensation Clause of the Fifth Amendment of the Federal Constitution is made applicable to the States through the Fourteenth Amendment. *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160, 101 S.Ct. 446, 450, 66 L.Ed.2d 358 (1980); *see Chicago, B. & Q. R. Co. v. Chicago*, 166 U.S. 226, 239, 241, 17 S.Ct. 581, 585, 586, 41 L.Ed. 976 (1897). That clause provides in clear and unequivocal terms: "[N]or shall private property be taken for public use, without just compensation." U.S. Constitution, Amendment V. By the Ordinance, a compensable regulatory taking occurred to Legacy's Property because the ordinance imposes restrictions that "unreasonably interfere with landowners' rights to use and enjoy their property." *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104,124 (1978). In this regard, the Ordinance unreasonably interferes Legacy's right to use and enjoy the Property because: 1) the Ordinance imposes an extreme economic impact on Legacy and the Property such as lost development profits; (2) the Ordinance interferes with distinct investment-backed expectations of Legacy which is to develop the Property for modular homes prior to the imposition of the Ordinance; and (3) the character of the Ordinance constitutes discriminatory zoning directed at Legacy and its Property to prohibit modular homes and does not advance a legitimate state interest or promote a common good.

30. Specifically, the Ordinance imposes additional and unnecessary burdens on Legacy's investment backed expectations for the Property by limiting, restricting, requiring registration and high insurance requirements that drive up costs for Legacy to retain necessary subcontractors and tradesmen to develop the Property for modular homes as intended when purchased that are not applicable to non-modular home developers who can hire any electrician or

plumber without such requirements. Additionally, subcontractors, plumbers and electricians working on manufactured homes are subject to business profile and background checks conducted by the City, whereas plumbers and electricians working on non-manufactured housing are not. The City has further imposed an arbitrary cap on the number of construction permits it will issue to Legacy for speculative builds. Legacy owns approximately 297 manufactured housing lots in the City. It takes approximately seven months to develop a manufactured home in the City, and under the current cap of two permits, it would take Legacy approximately 87 years to develop all of its lots, if it developed two lots at a time. The City has used its cap on speculative building permits to, essentially, forbid Legacy from developing manufactured housing.

31. In addition, the City imposes high utility fees on Legacy that have no relation to the use of the Property by Legacy in order to cover costs that should be paid by others or the City itself. For example, Legacy is made to purchase "grinder equipment" priced at $2,525 along with a fee in excess of $10,105 for utility hook-up. Manufactured homes typically have a much smaller footprint than many of the homes found in the City. The City Ordinance also imposes a requirement that manufactured homes have permanent foundations which is not typical for modular homes. As a result of the Ordinance's strenuous lot requirements for setbacks, driveways, porches, decks, and patios directed primarily at Legacy and its Property, Legacy is left with a lot that is virtually undevelopable for modular homes purposes. These and other restrictions and limitations in the Ordinance have caused development lost profits and have had a severe economic impact on Legacy and its Property. Further, the Ordinance has interfered with Legacy's distinct investment-backed expectations to develop the Property for modular homes. These regulations in large part do not apply to non-modular home developers, are directly primarily at Legacy and its Property and thus, constitute discriminatory zoning. The above conduct on the part of the City

establishes a regulatory taking under the Fifth Amendment and as to the utility fees and grinder equipment, constitute an exaction which is also a taking under the Fifth Amendment.

### COUNT III- CIVIL CONSPIRACY AGAINST THE POA AND THE RESORT

32.Legacy repeats and incorporates by reference the paragraphs above, as applicable, as if fully restated herein.

33.The conduct of Defendants POA and The Resort, constitutes an actionable civil conspiracy to accomplish an unlawful purpose by unlawful means, that being to prohibit Legacy from developing its Property for modular homes without legal justification.  The Defendants all participated in the concert of conduct with the intention to deprive Legacy of the right to develop its property for modular homes, and in that regard had a meeting of the minds on this objective and course of action.  One or more of the overt acts of the Defendants is unlawful and caused Legacy to suffer damages as a proximate result.

34.Therefore, the Defendants are all liable for their participation in the objective and the resulting harm to Legacy and its development of the Property for modular homes.  Such conduct on the part of the Defendants constitutes actionable civil conspiracy at common law.

### COUNT IV- BREACH OF FIDUCIARY DUTY AGAINST THE POA

35.Legacy repeats and incorporates by reference the paragraphs above, as applicable, as if fully restated herein.

36.The POA owes a fiduciary duty to Legacy as a member of the association to use the property and due in a manner consistent with the Articles of Incorporation and in the best interest of the members.  In that regard, the POA owed a high duty of good faith, fair dealing, honest performance, and strict accountability under the Restatement (Second) of Agency.  As agents, the POA must fulfill their duties with reasonable care, diligence, good faith, and judgment, and failing to do so, they will be liable to the members of the association, including Legacy for the

resulting damage.  The POA breached their fiduciary duties when they conspired against Legacy to prevent the lawful development of the Property for modular homes and engaged in conduct aimed to prevent the development.  In addition, the POA accepted funds from the City and did not use them in fair and equal fashion for all members of the POA or in the best interest if the members of the POA.  In fact, the POA engaged in a conspiracy to benefit the Resort and the City over the interests of the POA members. This conduct is in violation of the POA purposes as stated in the Articles of Incorporation, constituting *ultra vires* conduct.

37. The Defendant POA's breach of fiduciary duties in this regard caused Legacy to suffer damages, including but not limited to the cost to loss of Development profits and diminution in the value of the Property.  RESTATEMENT (SECOND) OF AGENCY, § 401 (1958).

## COUNT V- NEGLIGENCE AGAINST THE POA AND THE RESORT

38. Legacy repeats and incorporates by reference the paragraphs above, as applicable, as if fully restated herein.

39. The Defendant POA and the Resort had a duty to exercise ordinary care in its dealings with Legacy with regard to the Declarations and the use of POA property.  The Defendants breached this duty acted in such a manner so as to prohibit the lawful development of the Property by Legacy and used its powers to stifle the development, prevent issuance of permits to Legacy and to impose unlawful hurdles for Legacy to obtain development permits and variances from the City.  The POA and the Resort also conspired with the City to prohibit Legacy from developing the Property for modular homes.  In addition, The POA committed *ultra vires* acts in prohibiting Legacy the use of common owned land (i.e. the five foot strip of land) for access to the following land:

> 94.77 acre tract of land consisting of approximately 77.95 acres out of the Joseph Harrell Survey No. 570. Abstract No. 953, 9.19 acres out of the John Darlin Survey No. 4, Abstract No. 248, 7.95 acres out of the A.C. Fuch Survey No. 1448, Abstract

   No. 1484 and 0.09 acres out of the McKinney and Williams Survey No. 624, in
   Burnet County, Texas.

(the "Land").  Such conduct is in violation of the Articles of Incorporation and the POA's stated purpose, and in violation of the Texas Non-Profit Corporations Act, which is negligence *per se*.

   40. The above-described conduct on the part of the Defendants constitutes negligence and gross negligence at common law, which entitles Legacy to actual and punitive damages from Defendants.  Legacy also seeks that it not be required to pay POA dues as to the Property or the Land and that such Property and Land be ordered exempt from such payments and assessments.

COUNT VI- REQUEST FOR INSPECTION OF RECORDS AGAINST THE POA

   41. Legacy repeats and incorporates by reference the paragraphs above, as applicable, as if fully restated herein.

   42. The Amended and Restated By Laws of the Horseshoe Bay Property Owners Association, Inc., a Non Profit Corporation, dated November 15, 2017, Article XV, provides that Legacy, as a member, is entitled to an accounting and inspection of all books and records for any proper purpose at any reasonable time.  Legacy requests that it be allowed such inspection to determine the discriminate and unequal allocation of the dues paid by it and other members as well as the funds received by the City in support of its claims asserted herein.

COUNT VIII- STRIP AND GORE AGAINST THE POA AND RESORT

   43. Legacy repeats and incorporates by reference the paragraphs above, as applicable, as if fully restated herein. The Declarant Resort from whom the Land was purchased

   44. At its most northern point, the Land borders a five-foot strip of land located in the City that the POA/Resort claims they (individually or conjunctively) own. Similarly, Legacy owns land that directly borders both sides of the five-foot strip.  The POA has refused Legacy access to the five-foot strip and threatened to press criminal charges against anyone, including Legacy and

other POA dues paying members like the South residents, if they cross the strip of land. Legacy requests the Court declare that Legacy owns the five-foot strip of land under the doctrine of Strip and Gores, and not the POA/Resort.

45. It is presumed that the Resort had no intention of reserving fee title in the five-foot strip of land adjoining the land conveyed to Legacy when it ceases to be of use to the POA/Resort unless such fee title is clearly reserved. Where, as here, the POA/Resort has conveyed all land owned by them adjoining the narrow five-foot strip of land that has ceased to be of any benefit or importance to them, the presumption is that the POA/Resort intended to include such strip in such conveyance to their grantee Legacy, unless it clearly appears in the deed, by plain and specific language, that the POA/Resort intended to reserve the strip. *Stravhorn v. Jones*. 157 Tex. 136, 300 S.W.2d 623 (1957). An instrument of conveyance is construed to include a small parcel because it is against public policy to leave title of a small parcel in a grantor conveying a larger tract adjoining or surrounding the small parcel. *Alkas v. United Savings Association of Texas, Inc.*, 672 S.W. 2d 852 (Corpus Christi. 1984). The Court in *Alkas* sets out the following requirements of such construction:

a. The tracts claimed are small in comparison to the land conveyed:

b. The title to the tracts were in the grantor at the time of the conveyance; and

c. The tracts were of no benefit or importance to the grantor.

46. In this case, the land claimed by the POA/Resort is small in comparison to the 95 acres deeded to Legacy by the Resort as Declarant. The five-foot strip claimed by the POA/Resort are strips and gores providing access to the Property and Land conveyed to Legacy. Title to the Land was in the POA/Resort as of the date of conveyance. The strip has ceased to be of any benefit or importance to the POA/Resort. Such five-foot strip was not specifically reserved by the POA/Resort. Legacy is entitled to further declaration pursuant to Rule 57 of the Federal Rules of

Civil Procedure and 28 U.S.C.A. § 2201 that it owns in fee simple the five-foot strip of land under the doctrine of strip and gores and/or is entitled to access the five-foot strip of land for ingress and egress for the Property and Land.

## IX.  PRAYER FOR RELIEF

47.     WHEREFORE, PREMISES CONSIDERED, Plaintiff Legacy Homes Corporation prays that the Defendants be cited to appear and answer herein.  Legacy prays that upon final hearing that it have and recover judgment against Defendants for declaratory judgment as provided herein, actual damages, consequential damages, statutory additional damages, punitive damages, maximum allowable prejudgment and post judgment interest, attorney fees and costs of court. Plaintiffs pray for other and further relief to which Legacy may be justly entitled.

Respectfully submitted,

By:     /s/ *J. Hampton Skelton*

J. Hampton Skelton
State Bar No. 18457700
hskelton@skeltonwoody.com
Alysia Wightman
State Bar No. 00785245
agwightman@skeltonwoody.com
SKELTON & WOODY, PLLC
248 Addie Roy Road, Suite B-302
Austin, Texas 78746
Telephone:  (512) 651-7000
Facsimile:   (512) 651-7001

**ATTORNEYS FOR PLAINTIFF
LEGACY HOUSING CORPORATION**